# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: <u>1:23−mj−00447−LB</u>−1

Case title: USA v. Yang                    Date Filed: 05/10/2023

Assigned to: Magistrate Judge
Lois Bloom

**<u>Defendant (1)</u>**

**Li Jin Yang**                    represented by **Jacob B. Mitchell**
The Law Office of Jacob Barclay Mitchell
225 Broadway
Suite 2815
New York, NY 10007
212−204−2574
Email: <u>jacobbarclaymitchell@gmail.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**<u>Pending Counts</u>**                    **<u>Disposition</u>**

None

**<u>Highest Offense Level</u>**
**<u>(Opening)</u>**

None

**<u>Terminated Counts</u>**                    **<u>Disposition</u>**

None

**<u>Highest Offense Level</u>**
**<u>(Terminated)</u>**

None

**<u>Complaints</u>**                    **<u>Disposition</u>**

21:846=ND.M

**<u>Plaintiff</u>**

**USA**                    represented by **Andrew Reich**
U.S. Attorney's Office
271 Cadman Plaza East

Brooklyn, NY 11201
Email: Andrew.Reich@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/10/2023 | 1 | RULE 40 AFFIDAVIT by USA as to Li Jin Yang by Affiant Anthony Jimenez (MS) (Entered: 05/15/2023) |
| 05/10/2023 | | Arrest (Rule 40) of Li Jin Yang (MS) (Entered: 05/15/2023) |
| 05/10/2023 | | Minute Entry for proceedings held before Magistrate Judge Lois Bloom: For a Removal hearing to the Western District of OklahomaArraignment as to Li Jin Yang (1) Count Complaint held on 5/10/2023, Attorney Appointment Hearing as to Li Jin Yang held on 5/10/2023, Initial Appearance in Rule 5(c)(3) Proceedings as to Li Jin Yang held on 5/10/2023. AUSA Andrew Reich; CJA counsel Jacob Mitchell. Waiver of hearing entered. Brady Act ordered on the record. Both parties on consent for a bail package with conditions. The Court granted bail as stated on the record. 1 Surety was sworn and advised and signed the bond. The defendant was advised of all conditions and signed the bond. The Defendant was released. (FTR Log #4:41–5:28.) (MS) (Entered: 05/15/2023) |
| 05/10/2023 | 2 | CJA 23 Financial Affidavit by Li Jin Yang (MS) (Entered: 05/15/2023) |
| 05/10/2023 | 3 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations. as to Li Jin Yang. Ordered by Magistrate Judge Lois Bloom on 5/10/2023. (MS) (Entered: 05/15/2023) |
| 05/10/2023 | 4 | CJA 20 as to Li Jin Yang: Appointment of Attorney Jacob B. Mitchell for Li Jin Yang.. Ordered by Magistrate Judge Lois Bloom on 5/10/2023. (MS) (Entered: 05/15/2023) |
| 05/10/2023 | 5 | ORDER Setting Conditions of Release as to Li Jin Yang (1) 200,000. Ordered by Magistrate Judge Lois Bloom on 5/10/2023. (MS) (Entered: 05/15/2023) |

AB:ADR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

         - against -

LI JIN YANG,
     also known as "Lily,"

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**REMOVAL TO THE
WESTERN DISTRICT OF
OKLAHOMA**

(Fed. R. Crim. P. 5)

Case No. 23-MJ-447

EASTERN DISTRICT OF NEW YORK, SS:

        ANTHONY JIMENEZ, being duly sworn, deposes and states that he is a Special

Agent with the United States Department of Homeland Security, Homeland Security

Investigations ("HSI"), duly appointed according to law and acting as such.

        On or about May 2, 2023, the United States District Court for the Western District

of Oklahoma issued a warrant for the arrest of the defendant LI JIN YANG, also known as

"Lily," for violations of Title 21, United States Code, Section 846.

        The source of your deponent's information and the grounds for his belief are as

follows:[1]

        1.      On or about May 2, 2023, the United States District Court for the Western

District of Oklahoma issued an arrest warrant (the "Arrest Warrant") for the arrest of defendant

LI JIN YANG for violations of Title 21, United States Code, Section 846.    A true and correct

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

USCA2 3

2

copy of the Arrest Warrant is attached hereto as Exhibit A, and a true and correct copy of the criminal complaint charging YANG with violations of 21 U.S.C. § 846 is attached hereto as Exhibit B.

2.      On or about May 10, 2023, LI JIN YANG was arrested by HSI agents at a residence at 17 Darcy Avenue in Manorville, New York.   At the time of her arrest, YANG confirmed her name to HSI agents.

3.      HSI arresting agents recognized LI JIN YANG from previous surveillance they had conducted and from a photograph that had been provided to them by agents in the Western District of Oklahoma.   HSI agents also verified YANG's identity on a Michigan State driver's license provided by her upon her arrest.   The photograph on the license was consistent with YANG's appearance and with the photograph from the Western District of Oklahoma that agents had previously reviewed, and the name and date of birth listed on the license was consistent with that of the LI JIN YANG wanted in the Western District of Oklahoma.

4.      Finally, HSI agents asked LI JIN YANG her date of birth, and her response matched the date of birth of the LI JIN YANG wanted in the Western District of Oklahoma.

5.      Based on the foregoing, I submit that there is probable cause to believe that the defendant is the LI JIN YANG wanted in the Western District of Oklahoma.

WHEREFORE, your deponent respectfully requests that the defendant LI JIN

YANG be removed to the Western District of Oklahoma so that she may be dealt with according

to law.

*S/ Anthony Jimenez*
ANTHONY JIMENEZ
Special Agent
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
_10_ day of May, 2023

*S/ Lois Bloom*
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# EXHIBIT A

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Li Jin Yang, | ) | Case No.    M-23-277    -STE |
| a/k/a Lily, | ) | |
| | ) | |
| | ) | |
| | ) | |

_Defendant_

## ARREST WARRANT

To:    Any authorized law enforcement officer

     **YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
_(name of person to be arrested)_    Li Jin Yang                                       ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☑ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:

   21 U.S.C. § 846, Drug Conspiracy

Date:      05/02/2023                                  _Shon T. Erwin_
                                                   _Issuing officer's signature_

City and state:    Oklahoma City, Oklahoma              Shon T. Erwin, U.S. Magistrate Judge
                                                       _Printed name and title_

| Return |
|---|
| This warrant was received on _(date)_ _____ , and the person was arrested on _(date)_ _____ |
| at _(city and state)_ _____ . |
| |
| Date: _____                                     _Arresting officer's signature_ |
| |
|                                                  _Printed name and title_ |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____     Weight: _____

Sex: _____     Race: _____

Hair: _____     Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____

# EXHIBIT B

AO 91 (rev.11/11) Criminal Complaint   **AUTHORIZED AND APPROVED DATE**, s/Nick Coffey 5/1/2023

# United States District Court
## for the

| WESTERN | DISTRICT OF | OKLAHOMA |
| --- | --- | --- |

United States of America ) 
)
v. )
)
)   Case No: M-23- 277   -STE
Naigang Lin, )
  a/k/a Nai Lin, )
Naiyang Lin, )
  a/k/a Nai Yang Lin, )
Li Jin Yang, )
  a/k/a Lily, )
Dong Lin, )
Chang-Hui Chen, )
Meiyan Xiao, )
Barry Stadler, )
Daniel Walsh, )
Terrance Jamahl Allen, )
Fei Xie, )
Ahmed Salim Harrold, and )
Luis Rafael Larios-Benites, )

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about January 1, 2019, and continuing thereafter until on or about May 1, 2023, in the county of Oklahoma, in the Western District of Oklahoma, and elsewhere, the defendants violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 21 U.S.C. § 846 | Drug Conspiracy |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent, Josh Reinsch, Homeland Security Investigations (HSI), which is incorporated and made a part hereof by reference.

☒ Continued on the attached sheet.

Josh Reinsch
Special Agent
HSI

Sworn to before me and signed in my presence.

Date: **May 2, 2023**

*Judge's signature*

City and State: Oklahoma City, Oklahoma

Shon T. Erwin, U.S. Magistrate Judge
*Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

**STATE OF OKLAHOMA** )
                           )
**COUNTY OF OKLAHOMA** )

## __AFFIDAVIT__

I, Joshua Reinsch, being first duly sworn, hereby depose and state as follows:

1.    I am a special agent ("SA") of the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and as such am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.    I have been employed as a special agent with DHS/ICE/HSI since January 2010. I am currently assigned to the HSI Office of Grand Rapids, Michigan.

3.    During the course of my employment, I have participated in numerous drug investigations involving marijuana, cocaine, heroin, fentanyl, and methamphetamine, which have resulted in the arrests of targets, the seizure of illicit drugs and drug-related evidence, and the forfeiture of drug-

related assets. I have conducted and supervised complex financial investigations involving the trafficking of drugs and other contraband, and money laundering including the structuring, placement, and layering of large amounts of U.S. Currency. I have participated in and/or executed search and seizure warrants authorizing the search of locations used by drug traffickers and their co-conspirators, as well as vehicles used to transport controlled substances. Materials searched for and recovered in these locations have included controlled substances, packaging materials, scales, cutting agents, weapons, documents and papers reflecting the identities of co-conspirators and receipts for concealed investments, and proceeds from the distribution of controlled substances. I have personally participated in interviews of witnesses and cooperating sources regarding illegal trafficking in drugs and have read official reports of similar interviews by other officers. I have also participated in surveillance operations, observing and recording movements of persons trafficking drugs and those suspected of trafficking drugs.

4. I have participated in four federal wiretap investigations throughout my career. During those wiretap investigations, I acted as a wire room supervisor, and as surveillance and operations Team Leader. During all of the above-referenced wiretap investigations, I drafted affidavits for search warrants, organized surveillance operations, interviewed suspects, and executed search warrants. I have conducted minimization, monitoring, and

USCA2 12

summarization procedures required as part of a wiretap investigation. I also authored numerous tracking warrants to obtain precision location information for cellular telephones. As a result, I have gained knowledge of the methods utilized by drug traffickers and other criminals to avoid detection by law enforcement.

5.     In the course of conducting drug investigations, I have personally interviewed confidential sources and persons involved in the distribution of illegal drugs. I have consulted with other experienced investigators concerning the practices of drug traffickers and the best methods of investigating them. In preparing this affidavit, I conferred with other Special Agents and law enforcement officers.

6.     The facts set forth in this Affidavit are based upon my personal knowledge, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, communications with other individuals who have personal knowledge of the events and circumstances described herein, and information gained through training and experience. Since this Affidavit is being submitted for the limited purpose of seeking a complaint and arrest warrants against the individuals named below, I have not included every fact known to me concerning this investigation. Rather I have set forth only the facts I believe are essential to establish the foundation necessary to support the complaint and arrest warrants.

3

## PURPOSE OF AFFIDAVIT

7.     I make this affidavit in support of a criminal complaint and arrest warrants for **NAIGANG LIN**, **a/k/a "NAI LIN" (LIN)**; **NAIYANG LIN, a/k/a "NAI YANG LIN" (NAIYANG), LI JIN YANG, a/k/a "LILY" (YANG), DONG LIN (DONG), CHANG-HUI CHEN (CHEN), MEIYAN XIAO (XIAO), BARRY STADLER (STADLER), DANIEL WALSH (WALSH), TERRANCE ALLEN (ALLEN), FEI XIE (XIE), AHMED HARROLD (HARROLD),** and **LUIS RAFAEL LARIOS-BENITES (LARIOS),**   for their participation in a drug conspiracy—that is a conspiracy to possess with intent to distribute and to distribute marijuana, from in or about January 1, 2019, and continuing thereafter until on or about May 1, 2023, in violation of 21 U.S.C. § 846.

## BACKGROUND TO INVESTIGATION

8.     HSI, DEA, and IRS are presently investigating **LIN** and his associates for money laundering and black-market marijuana distribution. As explained in more detail below, **LIN**—a longtime Michigan resident— appears to have relocated to the Western District of Oklahoma, where he serves as a marijuana broker and distributor, taking advantage of the state's increase in marijuana grows—many of which investigators have determined are out of compliance with state law and are selling marijuana on the black-market in violation of both state and federal law.   I believe that **LIN** and his

4

organization (the LIN DTO) are being sourced by these marijuana grows and are also providing money-laundering services to them as well as laundering the LIN DTO's drug proceeds from **LIN's** various illegal operations.

9.      **LIN** first landed on HSI's radar in September of 2020 when he was stopped flying to New York City from Grand Rapids with $50,000 in U.S. currency.  The ensuing investigation has led agents to identify multiple co-conspirators in **LIN's** black-market-marijuana organization, including **LIN's** family members:  **LIN's** three brothers Naiyang Lin (**NAIYANG**), Naiqing Lin (NAIQING), Brandon Lin (BRANDON), and his mother Li Yang (**YANG**), and father Dong Lin (**DONG**).[1]

---

[1]      To be clear, I believe that **LIN** has been operating his DTO since at least 2017.  **LIN** was investigated in 2017 and 2018 by the FBI for wire fraud, illegal gambling, prostitution, and drug trafficking. As part of that investigation, law enforcement obtained and downloaded his cellphone. Examination of that data showed that **LIN** was engaged in marijuana trafficking as far back as 2017.  For example, **LIN's** phone contained conversations with Larry Tillman and Darius Tillman, whom law enforcement later identified as marijuana customers based on messages in **LIN's** phone discussing balances due for marijuana sales between them and **LIN**.  For example, on October 21, 2017, **LIN** asked "D" (Darius Tillman) if he had 14 Glu.  "D", not understanding, then asked if **LIN** got 14 pounds.  D then stated he could get Pops ready with the 1600.  And on November 21, 2017, **LIN** sent Larry Tillman a video of multiple pounds of marijuana.  **LIN** then told Larry to get the money together and bring the $550 to his mom. Based on my training, experience, and knowledge of the investigation, I believe that these messages show **LIN** coordinating with Darius and Larry Tillman to distribute marijuana.  Further evidencing that **LIN** was in fact engaged in marijuana distribution as far back as 2019 was his wage information from the state of Michigan indicating that in 2019 he claimed only $8,676.90 in wages, all from Oriental Asian Buffet, a Chinese restaurant in Grand Rapids, Michigan.

USCA2 15

10.     As part of this investigation, HSI agents have done extensive financial analysis on accounts utilized by known members of the organization and have discovered that **LIN** has orchestrated the laundering of approximately $25 million in illicit proceeds primarily from illegal marijuana grows.   **LIN** has also been implicated in illegal gambling and Ketamine trafficking as well.   Law enforcement believes that **LIN** and his associates are primarily using wire transfers, funnel accounts, and the purchase of real estate, cars, and businesses in order to launder their criminally derived proceeds, which I know from my training and experience is a common manner of laundering funds.   To date, law enforcement has seized the following from **LIN** and his organization: more than 4,000 marijuana plants from illegal marijuana grows, more than 3,500 pounds of processed marijuana, and over $225,000 in U.S. currency.

### *The LIN DTO*

11.     The following section is a brief description of the individuals charged in this criminal complaint:

a.     Naigang Lin (**LIN**):   **LIN** resides in Oklahoma City and heads a large-scale marijuana distribution operation for marijuana grows in Oklahoma.

b.     Naiyang Lin (**NAIYANG**):   **NAIYANG** is the brother of **LIN** and resides in Oklahoma City.   **NAIYANG** operates

6

marijuana grows in Oklahoma and assists **LIN** in money laundering activities.

c. Dong Lin (**DONG**): **DONG** is the father of **LIN** and resides in Oklahoma City. **DONG** operates the **LIN** family restaurant, Private Kitchen, and assists the organization distributing marijuana and operating marijuana grows.

d. Li Jin Yang (**YANG**): **YANG** is the mother of **LIN** and resides in Oklahoma City. **YANG** operates the **LIN** family restaurant, Private Kitchen, and assists the organization in distributing marijuana and operating marijuana grows.

e. Chang-Hui Chen (**CHEN**): **CHEN** resides in Oklahoma City and assists **LIN** in distributing marijuana and transporting bulk drug proceeds in and out of Oklahoma.

f. Meiyan Xiao (**XIAO**): **XIAO** resides in Oklahoma City and assists **LIN** in distributing marijuana and transporting bulk drug proceeds in and out of Oklahoma.

g. Barry Stadler (**STADLER**): **STADLER** resides in Michigan and serves as a marijuana and bulk cash courier for **LIN**.

h. Daniel Walsh (**WALSH**): **WALSH** resides in Florida and serves as a marijuana courier for **LIN**.

i. Terrance Allen (**ALLEN**): **ALLEN** resides in Texas and

7

serves as a marijuana courier for **LIN**.

j.     Ahmed Harrold (**HARROLD**):  **HARROLD** resides in Michigan and serves as a marijuana courier for **LIN**.

k.     Fei Xie (**XIE**):  **XIE**, who resides in Seattle, has been involved in the establishment of marijuana-related LLCs with **NAIYANG**, helps operate marijuana grows in Michigan, and also launders illicit funds from the LIN DTO.

l.     Luis Rafael Larios-Benites **(LARIOS):  LARIOS** resides in Oklahoma and serves as a marijuana courier for **LIN**.

### *The LIN DTO First Established its Black-Market Marijuana Operation in Michigan*

12.   Though **LIN** has since relocated the LIN DTO to Oklahoma City, it previously was headquartered in Michigan. For instance, on May 15, 2021, HSI conducted surveillance at 5189 Bonasa Dr NE, Rockford, MI (the "Bonasa Residence"). [2]   While conducting surveillance, two rental vehicles were observed at the residence, a Nissan Armada and a Kia Optima.  Agents observed a third rental vehicle, a Jeep Cherokee, arrive at the residence.

---

[2]     The Bonasa Residence was identified by law enforcement when bank documents were obtained from Lake Michigan Credit Union when NAIQING opened an account on **LIN's** behalf and deposited $30,000 in cash.   NAIQING then tried to issue a cashier's check for the purchase of a commercial building located at 1400 Sunset Ave, Lansing, Michigan.   When asked for proof of residence, NAIQING provided a lease agreement with **LIN** (acting as a landlord) that indicated the residence for NAIQING was the Bonasa Residence.

USCA2 18

After a short time, multiple individuals exited the residence, including **LIN**, **XIE**, and a female later identified as Amy Nguyen (NGUYEN). While exiting the residence, **XIE** and NGUYEN were observed carrying large totes and placing them into the rear hatch of the Jeep Cherokee. After the totes were placed in the Jeep Cherokee, all three vehicles left at the same time driving in tandem with the Jeep Cherokee in the middle of the Nissan Armada and Kia Optima. NGUYEN was driving the Jeep Cherokee, **LIN** was driving the Nissan, and **XIE** was driving the Kia. Agents continued surveillance on the vehicles as they left the residence. While following all three vehicles, surveillance observed the vehicles remaining very close to one another as to not let any vehicles in between them. Based on my training and experience, drug traffickers will often drive cars in tandem in this fashion around a load vehicle to make it more difficult for a law enforcement vehicle to pull in behind and stop the actual load vehicle. At that time, agents notified the Michigan State Police ("MSP") of the activity. MSP observed the Jeep Cherokee commit a moving violation and conducted a traffic stop on the vehicle.

13. During the stop, MSP identified NGUYEN as the driver and sole occupant of the Jeep Cherokee. NGUYEN consented to a search of the vehicle. MSP discovered approximately 28 pounds of high-grade marijuana located in the totes. During the traffic stop, NGUYEN asked to retrieve multiple phone numbers from her phone, including the phone number for a contact name

USCA2 19

"Nai," (908) 935-8888, which was utilized by **LIN**. NGUYEN consented to a search of her cell phone, and investigators found a text message from **LIN** to NGUYEN's cell phone that referenced "5500 Division." 5500 Division Ave S, Grand Rapids, Michigan (the "5500 Division Location") is a property that has been linked to **LIN** through both the open-source records and surveillance.[3] After the encounter, MSP released NGUYEN and seized the marijuana.

14.     On August 16, 2021, law enforcement conducted a trash pull at the 5500 Division Location. While going through the trash, agents discovered marijuana stalks and marijuana leaves, along with potting soil. Agents previously suspected that part of the commercial building was being utilized as an illegal marijuana grow for the **LIN** organization when on several occasions, including July 13, 2021, agents observed **NAIYANG** arriving at the building and taking in several jugs of Advanced Plant Nutrients Connoisseur Grow. Agents know that this chemical is used to help grow marijuana plants.

15.     On August 20, 2021, **XIE** flew from Seattle to Detroit, Michigan and arrived in Grand Rapids, Michigan later in the day. Agents surveyed **XIE**

---

[3]     For instance, two of the LIN DTO's businesses list their registered addresses as the 5500 Division Location: database checks through the Michigan Department of Licensing and Regulatory Affairs ("LARA") indicate that **NAIYANG** established multiple LLCs in 2020 to include Hydro Republic LLC and Thrive Corp LLC, with their address being the 5500 Division Location. **NAIYANG** also established Homerich Property Management LLC, which, as discussed *infra*, is an illegal marijuana grow 9460 Homerich Ave SW, Byron Center, MI. These LLCs also listed **XIE** as an organizer.

10

as he arrived at the 5500 Division Location and met with **LIN**. **LIN** and **XIE** departed in **XIE**'s rental vehicle and drove to Lansing, Michigan. On August 21, 2021, agents resumed surveillance of **XIE** has he departed his hotel and traveled to one of **LIN**'s residences at 3040 Hamlet Circle, East Lansing, Michigan ("the Hamlet Residence"), where he picked up **LIN** and **NAIYANG**. Agents continued to follow **XIE** as they traveled to 1400 Sunset Ave., Lansing, MI ("the Sunset Location"). **LIN**, **XIE**, and **NAIYANG** remained at the property for approximately eight minutes before departing and returning to the Hamlet Residence. **LIN**, **XIE**, and **NAIYANG's** presence at the Sunset Location would take on additional significance when, in February 2022, law enforcement confirmed the location was a marijuana grow when they executed a search warrant there and found 1,079 marijuana plants.

16.   On September 24, 2021, **XIE** traveled from New York City to Detroit, Michigan, where he rented a vehicle and drove to Lansing, Michigan. Traveling with **XIE** was an individual later identified (via a traffic stop) as Hugo Sarcone (SARCONE). While in Lansing, **XIE** and SARCONE picked up **LIN** at the Hamlet Residence and traveled to the Sunset Location, 5253 Division Ave S, Grand Rapids, Michigan ("the 5253 Division Location,"), the 5500 Division Location, 1744 68th St. SW, Byron Center, Michigan (the "68th St. Residence), and 9460 Homerich Ave. SW, Byron Center, Michigan (the "Homerich Residence"). Each of these locations has been identified as either

11

a marijuana stash location or an illegal marijuana grow utilized by **LIN** and **XIE**.

17.     On October 6, 2021, the MSP executed a search warrant at the Homerich Residence.   In the months prior to the search warrant, agents surveilled not only **LIN** but also other members of the organization here, including **YANG**, **DONG, XIE**, and **HARROLD**.   During the search, agents located an indoor marijuana grow and seized approximately 3,030 marijuana plants and approximately 42 pounds of processed marijuana.     Further investigation confirmed that the electric utilities for the Homerich Residence are registered to "Jason Lee," with an email address of nailin0219@yahoo.com—the same email address listed for **LIN** in financial documents obtained by investigators.

18.     Also during the search warrant at the Homerich Residence, law enforcement encountered four Mexican nationals who arrived at the residence in a Honda Odyssey van with Michigan license plate EFG3906.   Database checks indicate this vehicle is registered to **LIN**.   All four individuals were interviewed separately on scene and all four admitted to being hired by **LIN** and his mom "Lilly," known to law enforcement as **YANG**.    All four indicated they were farmers and there to grow and process the marijuana that they then delivered every two weeks to **LIN's** and "Lilly's" residence, which they identified as the 68th St. Residence.     All four individuals consented to a search

12

of their phones and showed law enforcement the numbers they used to contact **LIN**. One individual identified **LIN's** number as (616) 606-2484. In sum, the search warrant at the Homerich Residence further confirmed what investigators suspected, namely that **LIN** and his associates were a large-scale marijuana producers and distributors.

19. On October 1, 2021, **XIE** and his family were flying back from Cancun, Mexico, into JFK International Airport. HSI agents had been previously notified that **XIE** would be flying into the United States on this date and coordinated with HSI agents and Customs and Border Protection (CBP) officers at JFK to conduct a border search of **XIE**'s electronic devices. Due to JFK being an international airport, it is the functional equivalent of the border into and out of the United States, thereby authorizing border searches. CBP and HSI obtained **XIE's** electronic devices and conducted a forensic examination before returning them to **XIE**.

20. A forensic examination of **XIE's** laptop showed that **XIE** and **LIN** have business entities and that **XIE** is a financier and an individual that produces legal documents for the purchasing of various marijuana grows in Michigan and Colorado. The following are examples of some of the documents found on **XIE's** computer relating to marijuana grows:

> a. Regarding 1400 Sunset Ave, Lansing, Michigan: A hand-written document from **LIN** to **XIE** indicating that **LIN** received

13

$200,000 from Feilos Holding LLC (owned by **XIE**) on March 13, 2020, for the purchase of 1400 Sunset Ave, Lansing, Michigan. There was also a commercial purchase agreement for **LIN** selling the Sunset Location to **XIE** for $350,000 on March 13, 2020. There were also multiple PDF documents from purchases on Amazon under the name the Sunset Collective for marijuana grow equipment to be sent to **LIN** at 2866 Turtle Creek Drive, East Lansing, Michigan.

b.      A PDF file titled "Mansion Expense – Nai" which was 150 pages of receipts appearing to be from **LIN** to **XIE** for expenses used to cultivate the marijuana grow at the Homerich Residence.

c.      Multiple documents related to a marijuana grow located at 24600 County Rd 40, La Salle, Colorado [4] (the "La Salle Residence"). These documents included an excel sheet with an entire financial breakdown of expenses used to start the grow as well as profit margins anticipated once the grow was active. There were also closing documents on **XIE's** computer for the La Salle Residence which indicated Yingwen Zhen purchased the

---

[4]      A now closed Fifth Third Bank account utilized by **NAIYANG** sent a $64,000 wire to a Yingwen Zhen on June 16, 2020. Financial analysis of Zhen's Wells Fargo account indicated the money was used to purchase 24600 County Rd 40, La Salle, Colorado.

property and received a loan from a Joann Cho in the amount of $511,000.

d.      Two invoices referencing the "Cloud Nine Project." These invoices were dated March 4, 2021, and indicated that **XIE** received a $80,000 wire from a Zhexin Liu and a $150,000 loan from Miao Yang. The invoices stated that Cloud Nine is a marijuana grow in Morenci, Michigan.

21.     The forensic examination also revealed chat and text messages from **XIE's** iPhone. In these messages, spanning from September 22, 2021, through September 24, 2021, the following chat occurred between **XIE** and an individual named Mondi Rakah (RAKAJ):

a.      **XIE**: "Friday you go to meeting right? Let's discuss our project after the meeting. I bring a customer to Michigan to shop, if you have sample to show him will be great, he moves big. And I also want to discuss the sunset project with you" (September 22, 2021)

b.      RAKAJ: "Hi Fei, I will do my best to be at metting. Also we will discuss Sunset yes" (September 23, 2021)

c.      **XIE**: Sounds good. I just landed. I have my street biz partner Hugo with me to visit my farm, do you and Tony got some good samples to show him? We can discuss after the meeting

15

(September 24, 2021)

22.    It should be noted that, as described in paragraph 16, on September 24, 2021, **XIE** traveled to Michigan with SARCONE, where they visited **LIN's** and **XIE's** various stash houses and grows.  Based on my training, experience, and knowledge of the investigation, I believe this conversation provides further evidence that **XIE** was acting as a marijuana broker and that when **XIE** and SARCONE traveled with **LIN** to the various grows and stash houses in Michigan, I believe it was to broker marijuana deals on behalf of the LIN DTO.

23.    Surveillance and analysis of the above-described messages and documents leads me to believe that **XIE** finances these illegal grows associated with the **LIN** DTO and also obtains various individuals to invest in the grows. **XIE** appears to maintain cost analysis documents for these grows, oversees the production and growth of the grows for the **LIN** DTO, and then brokers buyers of the black-market marijuana.

24.    On December 8, 2021, law enforcement officers conducting surveillance at the 5500 Division Location followed an Asian male, believed to be **LIN** (a GPS ping on **LIN's** phone also indicated the phone was in the same area) and an unknown white male from the 5500 Division Location to Division Ave Self Storage—a storage facility located at 5633 Division Ave S, Wyoming, Michigan.  Detectives were able to determine that the two males went into

16

Unit A12 but were unable to maintain visual surveillance while they were at the storage facility.   After approximately 25 minutes, the two males departed the storage facility and went back to the 5500 Division Location, where they observed the Asian male put a large black trash bag[5] in a silver Chevrolet Tahoe parked at the business.   Law enforcement later approached Unit A12 and could detect a strong odor of marijuana emanating from the unit.

25.   On December 16, 2021, law enforcement submitted a subpoena to Division Ave Self Storage and obtained rental agreement containing **HARROLD's** name and signature that established that **HARROLD** was renting Unit A12 on December 8, 2021.   **HARROLD** also listed his phone number as (616) 334-9329.   Law enforcement also spoke with employees at the storage facility, who stated that on December 14, one worker had found unit A12 unsecured with no lock.   Upon checking the door, the worker found marijuana located inside the unit.   The worker informed **HARROLD** he could not keep the marijuana inside the storage unit, and **HARROLD** removed the marijuana that day.   Based on photos taken by the worker, which were provided to law enforcement, there were approximately 50 to 60 pounds of

---

[5]   Throughout this investigation, investigators have observed members of **LIN's** operation transporting what they believe to be marijuana inside large black trash bags.   Investigators are certain that this is the DTO's modus operandi, as investigators have made several seizes from couriers for this organization of large black trash bags containing packaged marijuana.

17

processed marijuana as well as multiple Home Depot boxes and packing equipment in the unit that were all ultimately removed by **HARROLD**.

26.     On January 19, 2022, HSI agents established surveillance of the 68th Street Residence.   At this time, GPS location information on **LIN's** phone number (616) 606-2484 indicated that **LIN** was in Oklahoma City, Oklahoma. While conducting surveillance, agents observed a red Chevrolet Impala bearing Michigan license plate 6NCC09, arrive at the residence.   Database checks indicate this vehicle is registered to **HARROLD** at 2855 Ottawa Ave SW, Grandville, Michigan.   Agents observed **HARROLD** exit the Impala and enter the residence.

27.     Several minutes later, **HARROLD** exited the residence through an open garage door carrying a large Home Depot box, which he put into the trunk of the Impala.   **HARROLD** then went back into the garage and came out with a second large Home Depot box, which he also put in the trunk. Agents observed that the boxes were fully taped and appeared heavy based on how **HARROLD** was carrying them.   Once the boxes were in the trunk, **HARROLD** departed in the Impala.

28.     Agents continued to follow **HARROLD** as he went to several locations suspected to be marijuana stash houses for the **LIN** organization and observed **HARROLD** put large black trash bags in the trunk of his vehicle. Agents then coordinated to have state law enforcement conduct a traffic stop

18

on **HARROLD**, whose vehicle was found to contain approximately 57.41 pounds of marijuana.

29. A federal search warrant was obtained for **HARROLD's** iPhone that was seized during the traffic stop. A forensic analysis of the phone indicates multiple conversations between **LIN**, using (616) 606-2484, and **HARROLD** referencing marijuana. For instance, on September 24, 2021:

  a.  **LIN** (under the name "Nai #1"): What up bro

  b.  **HARROLD**: What's on the agenda boss

  c.  **LIN**: Clean out north and south move the stuff to Muskegon

  d.  **HARROLD**: All of it?

  e.  **LIN**: Yes Sir

  f.  **LIN**: I think Ryan jamie and minh are over there

30. Based on my training, experience, and knowledge of the investigation, I believe that when **LIN** mentioned "stuff," he was referring to marijuana. Agents identified multiple properties north of Grand Rapids and in the southern part of Grand Rapids, as well as a warehouse in Muskegon, Michigan, that were connected to **LIN** and his organization. Specifically, I believe **LIN** was having **HARROLD** and others move marijuana to the Muskegon warehouse located at 1718 Broadmoor St., Muskegon, Michigan.

31. Another conversation occurred on November 20, 2021, between

**LIN's** (908) 935-8888 number and **HARROLD**:

a.     **LIN** (under the name "Jersy Boy"):   What u doing

b.     **HARROLD**:   I got two drivers let me when you want them to hit the road

c.     **LIN**:   Ok

d.     **LIN**:   I'm trying to figure it out

e.     **LIN**:   Who?

f.     **HARROLD**:   The big boy and the African

32.    It is my belief that based on the conversation, **HARROLD** found transport drivers for **LIN** that were willing to transport black market marijuana on **LIN's** behalf.

### LIN Relocates to Oklahoma City While the LIN DTO Continues to Operate in Michigan as well.

33.    In February of 2022, GPS location information on **LIN's** cellular device with phone number (616) 606-2484 indicated that **LIN** moved to Oklahoma City and established his operation there. Since his relocation, **LIN,** his family, and associates frequent Private Kitchen, a Chinese restaurant located at 1117 NW 25th Street, Oklahoma City, Oklahoma, which the **LIN** family owns. Private Kitchen appears to be a site where either drugs or drug proceeds are being aggregated. For instance, over the last several months, law enforcement has on several occasions observed individuals enter and exit

USCA2 30

Private Kitchen carrying backpacks, boxes, or luggage. This is of course odd because individuals do not typically carry such items into restaurants, and any restaurant's particular customer base certainly does not do it regularly.[6]

34. On February 16, 2022, Michigan state police executed three search warrants on premises owned and/or frequented by **LIN** and **NAIYANG**, specifically: (1) 3040 Hamlet Circle, East Lansing, MI (the "Hamlet Residence"), (2) 2866 Turtlecreek Dr., East Lansing, MI (the "Turtlecreek Residence") (owned by **LIN**), and (3) the Sunset Residence (owned by Feilos Holdings LLC, an LLC established by **XIE**). Each of those properties was found to contain marijuana, with the Hamlet Residence containing 85.25 pounds of marijuana, the Turtlecreek Residence containing 119.37 pounds of marijuana, and the Sunset Property containing 1,079 marijuana plants. While executing the search warrant at the Turtlecreek Residence, law enforcement encountered an individual who was one of the same Mexican farmers previously encountered at the search the Homerich Residence. This

---

[6] **LIN** himself seems to be aggregating at least cash at Private Kitchen. On December 21, 2022, agents surveilled **LIN** and several other individuals inside Private Kitchen. **LIN** appeared to grab a large brown paper bag from someone else inside the restaurant and pulled out what appeared to be large stacks of U.S. currency. **LIN** then appeared to lay the stacks of currency on a table and either count the money or take pictures of the money before departing with the cash in his jacket pockets. Based on my training, experience, and knowledge of the investigation, I believe that the cash was proceeds of a specified unlawful activity, likely marijuana trafficking.

21

individual told law enforcement that after the search warrant at the Homerich Residence, he/she moved to Lansing, Michigan to work at **LIN's** marijuana grows there. This individual also told law enforcement that **LIN** wants him/her to move to Oklahoma to work on his marijuana grows that are much bigger.

35. On March 8, 2022, law enforcement executed a state search warrant on the 5253 Division Location (owned by **LIN**) and discovered an illegal marijuana grow. Although it appeared as if the **LIN** organization had recently removed a lot of the grow, approximately 40 pounds of marijuana remained and was seized from the property.

36. On March 16, 2022, law enforcement was conducting surveillance of the 5500 Division Location and observed **YANG** and **DONG** arrive to the building in their Chevrolet Silverado bearing MI license plate EKJ9067 (registered to **LIN**). **YANG** and **DONG** met with **HARROLD**, who was already inside of the building, and the three individuals began bringing out large black trash bags that appeared to be full and matched the appearance of previous trash bags found to contain marijuana. For approximately 13 minutes, the three individuals put bags from the building into the vehicle before **YANG** and **DONG** drove to the Homerich Residence in the Silverado. Agents observed the vehicle outside the Homerich Residence for several minutes before it traveled back to the 5500 Division Location. Upon **YANG**

22

and **DONG's** arrival, **HARROLD** also returned and the three began loading more black trash bags into the Silverado and then tied down the bags. **HARROLD** was observed putting at least one bag into his Impala and all parties departed. **YANG** and **DONG** then went to the 68th St. Residence with the bags and pulled into the garage and closed the door. It is my belief that **YANG**, **DONG**, with assistance from **HARROLD** were transporting processed marijuana from the 5500 Division Location to the 68th St. Residence.

### Information Provided by Cooperators

37. During the course of the investigation, law enforcement has conducted interviews with both cooperating sources and cooperating defendants. Both have further corroborated that **LIN** is a prolific black-market marijuana broker.

38. One confidential human source (CS1), for instance, was previously stopped transporting marijuana on behalf of the LIN DTO. During a non-custodial interview several months after this traffic stop, CS1 told law enforcement that **LIN** and **XIE** are business partners; that **LIN** and **XIE's** organization collects money mainly through bulk cash and they have a group of people that transport marijuana for them; that **LIN's** parents **YANG** and **DONG** help him with his operation; and that **LIN**—who CS1 referred to as "the big one"—bought an old adult care facility that he turned into a poker house (referring to the 5500 Division Location).

23

39. One cooperating defendant (CD1), who had been traffic stopped with several hundred pounds of marijuana, stated in a proffer interview that he had been transporting that marijuana on behalf of **LIN**; that **NAIYANG** was also involved in the **LIN DTO**; that **LIN's** mom **YANG** would pay CD1 courier fees; and that **LIN** was also shipping Ketamine to New York. CS1 also identified the 500 Division Location as a poker house/casino.

40. Another cooperating defendant (CD2) was also previously arrested in possession of 200 pounds of marijuana while driving from Oklahoma to Kansas. CD2 stated there is a "transportation" company that people will call to move marijuana in Oklahoma City. CD2 was shown a picture of **LIN** and CD2 indicated he knew him but could not remember where. CD2 was asked about Private Kitchen, and CD2 indicated that is the restaurant where all the marijuana growers go. CD2 then asked to see a picture of **LIN** again and was shown a more recent photograph of **LIN**. CD2 indicated that **LIN** was the owner of Private Kitchen and that **LIN** will tell people that he will move money for them if it is over $10,000 and they want to avoid the banks for a $600 fee.

***STADLER's Courier Activities for LIN***

41. On April 21, 2022, **STADLER,** a known associate of **LIN's**, was arrested in West Virginia driving a vehicle (registered to **LIN's** brother NAIQING) containing 430 pounds of marijuana. **STADLER** was previously seen by HSI Oklahoma City agents in March of 2022 meeting with **LIN** at

24

Private Kitchen.   Prior, to his arrest, GPS location information on **STADLER**'s cellular device indicated that **STADLER** traveled to Oklahoma City on April 19, 2022, and was there for approximately an hour and a half before driving toward West Virginia.   During the two days prior to **STADLER**'s arrest, he used his phone number (616) 734-5425 to communicate with **LIN** at number (908) 935-8888 eighty times.

42.   A federal search warrant was obtained for **STADLER**'s phone, and forensic imaging yielded multiple conversations where **LIN** is directing **STADLER** to transport black market marijuana.   One example is on March 30, 2022, when **LIN** was utilizing phone number (908) 935-8888:

     a.    **LIN**:  1817 66st

     b.    **LIN**:  B25 4 boxes

     c.    **LIN**:  Collect documents from him

43.   Based on my training, experience, and knowledge of the investigation, **LIN** appears to be directing **STADLER** to an address to drop off particular boxes containing marijuana and pick up "documents", or cash.

44.   Another example is from April 5, 2022:

     a.    **STADLER**:  What's up

     b.    **LIN**:  Sorry, I can't talk right now

     c.    **STADLER**:   I'm in rest stop until u send

     d.    **LIN**:  Send me your zelle

e. **STADLER**: Deep green

f. **STADLER**: I sent request 1000 gui lin

g. **LIN**: I don't have that phone with me

45. Agents know through financial analysis that **LIN** utilizes his grandfather's (Gui Ming Lin) JPMorgan Chase account and believe that in this conversation **STADLER** was requesting payment for travel while transporting marijuana for **LIN**.

***The May 2022 Traffic Stop on LIN***

46. At approximately 11 p.m. on May 16, 2022, GPS on **LIN**'s cellular device indicated that **LIN** departed Byron Center, Michigan, heading southbound. During the morning of May 17, 2022, location information indicated that **LIN** was in Missouri and traveling towards Oklahoma City. HSI agents from the Oklahoma City office coordinated with the Oklahoma Bureau of Narcotics, who located the gray Tahoe as it entered the city and conducted a traffic stop after observed traffic violations. During the stop, **LIN** was identified as the sole occupant of the vehicle. Officers observed a large, folded stack of U.S. currency in the pockets of **LIN**'s pants. **LIN** stated that he and his friend had come into Oklahoma City the night before and were going to close on a house. The officer again asked **LIN** where he was coming from and **LIN** stated "the restaurant" in Chinatown, which was inconsistent with his direction of his travel. Further attempts were made by the officer to

26

clarify where **LIN** was coming from, but **LIN** could not explain his route of travel.

47.     Officers utilized a K-9 open-air sniff of the vehicle, which yielded a positive alert, and **LIN** was detained.   When asked if there were any drugs in the car, **LIN** indicated there were not.   When asked if there was a large amount of currency, **LIN** stated there was $90,000 in the vehicle from his restaurant and it was going to be used to buy a house.   A search of the vehicle revealed the following items: $90,000 in U.S. currency in a green bag and bundled in stacks with rubber bands, poker tables, boxes of dominos, boxes of playing cards, a notebook that appeared to contain ledgers of large money amounts, three cell phones, and vacuum-sealed bags.   During the search, the officer noticed that one of the phones in the vehicle displayed a GPS, which showed the vehicle had traveled from Vinita, Oklahoma, in the northeast part of the state—which contradicted **LIN**'s statement that he was coming from Chinatown in Oklahoma City.   After the search, **LIN** was released and the $90,000 and vacuum-sealed bags were seized by officers.   Based on this seizure and **LIN's** prior travel, I believe that **LIN** traveled from Oklahoma City to Washington D.C. and New York to Michigan gathering money that he was owed from prior drug smuggling activity and that the $90,000 he was travelling with was drug proceeds from the distribution of marijuana.

***The December 2022 Traffic Stop on WALSH***

27

48.     On December 19, 2022, Oklahoma Highway Patrol (OHP) conducted a traffic stop on **WALSH** in Oklahoma, which yielded approximately 262 one-pound bundles of marijuana.   Following the traffic stop, **WALSH** waived his Miranda rights and interviewed with OHP. During the interview, **WALSH** confirmed that he worked as a drug courier for a large-scale marijuana distributor based in Oklahoma City.   According to **WALSH**, he had transported bulk amounts of marijuana for the last six to seven months, making approximately two to four trips a month.   While most of the marijuana was from Oklahoma grows, **WALSH** did state that he sometimes would pick up marijuana from California, Georgia, and Michigan and bring it to Oklahoma for redistribution.   **WALSH** stated that for this trip, he had been driving to Florida.

49.     When asked to identify who precisely he was working for, **WALSH** could only state that they were Asian and that one of his employers had sent him a Zelle payment. (Zelle is the peer-to-peer mobile money transferring application that **LIN** appears to be utilizing.)   **WALSH** stated he often met his employers at a Chinese restaurant in Oklahoma City's Asian District.

50.     GPS location information on **LIN**'s cellular device (616) 606-2484 and on **WALSH**'s cellular device (989) 619-5756 during the day of December 19, 2022, indicated that beginning in the early morning hours of December 19, 2022, **LIN's** cellular device and **WALSH's** cellular device were in close

28

proximity to one another in different places in Oklahoma, including the Private Kitchen, the city of Norman, and an area near Lake Overholser. According to the GPS location information, after **LIN**'s device and **WALSH**'s were seen together near Lake Overholser, **WALSH**'s device began to move southbound out of the city into rural areas while **LIN**'s device traveled to Norman, Oklahoma, for a brief time before returning to Oklahoma City. Based on my training, experience, and knowledge of the investigation, I believe that the GPS location information on **LIN**'s device and **WALSH**'s device show **LIN** and **WALSH** meeting to coordinate the pickup of the 262 pounds of marijuana that was seized from **WALSH** just hours later the night of December 19, 2022.

51. A federal search warrant was obtained for two phones seized from **WALSH** on December 19, 2022. A forensic examination of one of the phones indicated WeChat messages between **WALSH** and an individual named Jesus. (I have identified "Jesus" as **LIN** because in one of the messages "Jesus" indicated he had arrived in Tampa on November 13, 2022; according to GPS data on **LIN**'s (616) 606-2484 device, LIN was in Tampa on November 13, 2022). One conversation occurred on November 25, 2022:

a. **LIN** ("Jesus"): Lmk when u boy rent that van

b. **WALSH**: We're finding one to pick up in the morning

c. **WALSH**: I'm going to drive as long as I Can tonight, and finish tomorrow

29

      d.   **LIN**: Ok

52.    A conversation that occurred between **LIN** and **WALSH** on November 30, 2022, continued the conversation from November 25, 2022:

      a.   **LIN**: 3295 Sardis Church Rd, Buford, GA 30519 United States

      b.   **LIN**: Goodwill

      c.   **WALSH**: Made it to wills

      d.   **LIN**: Ok

53.    Based on the conversation, **LIN** was having **WALSH** rent a vehicle to transport marijuana to Buford, GA and meet someone at a Goodwill. GPS location information from **STADLER** and **WALSH**'s phones shows that they frequently travel to Buford, Georgia. Given **STADLER** and **WALSH**'s admissions, agents believe that Buford is a location where **LIN** frequently sends marijuana.

### *STADLER'S Courier Activities Continue in Oklahoma*

54.    On January 6, 2023, surveillance observed **STADLER** at a house located at 5800 Sanabel Court, Oklahoma City (the "Sanabel Residence"). Based on the following observations, agents believe that the Sanabel Residence is a marijuana stash house used by **LIN** and the **LIN** DTO. On January 6, 2023, agents observed **STADLER** arrive in a black Chevrolet pickup with a camper shell on the back. While at the residence, **STADLER** appeared to go

around the side of the house. After approximately 12 minutes, **STADLER** returned to the vehicle and departed. Approximately two and a half hours later, **STADLER** returned and appeared to go to the side of the residence again. Shortly after, **STADLER** exited the residence carrying a large black trash bag that appeared to be heavy, which he loaded into his truck then departed. Approximately two minutes later, six males exited the residence, including **LIN**. Prior seizures during this investigation confirmed that this group often transports marijuana in black trash bags.

55. On January 7, 2023, agents again observed **STADLER** arrive at the Sanabel Residence and back into the driveway. **STADLER** returned to the side of the residence then later came back to the truck and offloaded what appeared to be empty boxes then departed. Based on my training, experience, and knowledge of the investigation, I believe that **STADLER** continues to serve as a marijuana courier for **LIN** and that the large black trash bag contained marijuana.

31

56.     On January 18, 2023, GPS location information on **STADLER**'s (616) 734-5425 cellular device indicated that **STADLER** departed Oklahoma City and drove to Buford, Georgia, in the black Chevrolet Silverado with a camper shell on the back (**STADLER** was seen in the vehicle on January 18 before departing).   Since law enforcement knows that **LIN** distributes marijuana in Buford, Georgia, I believe that **STADLER** transported marijuana to Buford on **LIN**'s behalf.

### LIN and CHEN's Recent Activities in Michigan

57.     On February 2, 2023, GPS location information on **LIN**'s cellular device (616) 606-2484 indicated that **LIN** was in the area of the 68th St. Residence.   Agents observed **LIN** exit the residence and depart in a white Toyota Camry bearing Michigan license plate DFF2703–which is registered to **LIN**'s brother BRANDON.   While conducting surveillance of **LIN**, agents observed **LIN** meet with Chang Chen (**CHEN**) at a Vietnamese restaurant in Grand Rapids, Michigan.

58.     **CHEN** departed in his white Lexus sedan bearing Michigan license plate EHY1334.   **LIN** departed in the aforementioned Toyota Camry and was followed back to the 68th St. Residence.   Upon arrival, agents observed **CHEN** in his Lexus already in the driveway.   Both **LIN** and **CHEN** then entered the residence and exited several minutes later carrying a large black trash bag which was put into the trunk of **CHEN's** Lexus.   Both **LIN**

32

and **CHEN** then departed in the Lexus and drove to the 5500 Division Location where they parked in the back of the building. Due to the location, agents could not directly observe **LIN** and **CHEN** while they were behind the building. They did, however, observe a blue Dodge Ram depart the area when **LIN** and **CHEN** departed in the Lexus back to the 68th St. Residence. Though law enforcement did not stop the blue Dodge Ram, the driver was a shorter black male with thinning facial hair, which matches the description of **HARROLD**.

59.     After **LIN** and **CHEN** left the 5500 Division Location, they traveled back to the 68th St. Residence where they were observed putting several more large trash bags in the trunk of **CHEN's** Lexus and then departing. Based on my training, experience, and knowledge of the investigation, I believe that **CHEN** and **LIN** obtained a trash bag full of marijuana from the 68th St. Residence and then traveled to the 5500 Division Location, where they delivered it to the individual matching **HARROLD's** description in the blue Dodge Ram pickup. I also believe **CHEN** and **LIN** obtained more trash bags containing marijuana from the 68th St Residence and loaded it into their vehicle.

### The February 2023 Marijuana Seizure from LARIOS and FLORES

60.     On February 9, 2023, during surveillance of a marijuana stash warehouse utilized by **LIN** located at 1224 N Council Rd, Oklahoma City ("the Council Warehouse"), agents observed a white GMC Denali bearing California

33

license plate 49817K3 arrive and an Asian male driver (later identified as Meiyan Xiao (**XIAO**)) exit the vehicle and enter the warehouse. Agents also observed a silver SUV and a blue Tesla sedan arrive at the location at around the same time. Agents had previously documented two rental vehicles at the Sanabel Residence several days prior.[7] It is believed that these are the same vehicles seen at the warehouse on this date. Soon after these vehicles arrived, a white Toyota Tundra bearing California license plate 93860U2 (registered to James and Maria Weaver at 4658 Fireside Dr, Turlock, California) arrived. A male exited the vehicle and walked into the warehouse.

61. After approximately seven minutes, **XIAO** departed in the GMC Denali. Agents followed and observed **XIAO** pull behind a church located to the north of the warehouse. When agents were able to re-establish surveillance on the Denali, it was coming back out of the church and immediately returned to the warehouse. Based on my training, experience, and knowledge of the investigation, this type of behavior is indicative of counter surveillance maneuvers performed to detect the presence of law enforcement.

---

[7] As reflected above, in connection with surveillance of **STADLER**, agents previously identified the Sanabel Residence as a marijuana stash house operated by **LIN**, **XIAO**, and **CHEN**, and which doubles as **XIAO's** and **CHEN's** residence.

34

62.     As the Denali returned to the warehouse, a white Honda minivan bearing Oklahoma license plate LJD217 (registered to Luis Larios-Benites (**LARIOS**)) arrived, and two Hispanic males exited the vehicle and entered the warehouse.   After approximately 45 minutes, **XIAO** exited the warehouse and departed in the Denali, returning to the warehouse approximately 45 minutes later.   When **XIAO** returned, **LIN** was observed opening one of the garage bay doors and XIAO pulled the Denali in.   A minute later, the Denali backed out of the garage and parked.   Although agents could not see **XIAO** in the garage, agents observed **LIN** talking to someone.   Based on my training, experience, and knowledge of the investigation, I believe that **XIAO** obtained bulk quantities of marijuana from somewhere and brought it to the warehouse so that it could be transferred to **LARIOS**.

63.     Several minutes later, the white Honda van backed into the garage that the Denali had been in and the door closed.   Two minutes later, the doors opened and the white van exited and pulled into the lot.   At the same time, an individual exited the warehouse and got into the white Tundra pickup with the California plate which had been at the warehouse when surveillance began.  **LARIOS's** van and the Tundra left in tandem.

64.     Agents continued to follow both vehicles as they traveled north on Council Road.   At this time, agents coordinated with Oklahoma Highway Patrol (OHP) to conduct a traffic stop on the white van.   After an observed

35

traffic violation, OHP initiated a traffic stop at Council Rd and NW 39th St. During the traffic stop, the OHP officer smelled a strong odor of marijuana coming from the vehicle. The officer then detained the driver, **LARIOS** and the passenger, Angel Joaquin Daniel Flores (FLORES), and conducted a search of the vehicle. During the search, approximately 162 pounds of marijuana was discovered in large black trash bags; officers also found a loaded pistol in the center console. **LARIOS** and FLORES were subsequently arrested.

65. It should be noted that **NAIYANG** has also been documented at the Council Warehouse. On March 2, 2023, GPS location information on **NAIYANG**'s cellular device (616) 606-2695 indicated that **NAIAYNG** was in the area of the Council Warehouse. Law enforcement's pole camera at the Council Warehouse corroborated this, as **NAIYANG** arrived and met with a transit van bearing Michigan license plate EJH0397, which is registered to **LIN**'s brother NAIQING. (This van has been seen at Private Kitchen on a daily basis and at the Sanabel Residence.) Both **NAIYANG** and the driver of the transit van entered the warehouse and opened the garage door. The driver of the transit van then pulled the van into the garage for approximately nine minutes before exiting and departing with **NAIYANG**. Based on my training, experience, and knowledge of the investigation—including that the Council Warehouse appears to be one of the marijuana stash locations for the LIN DTO—I believe that **NAIYANG** was coordinating either the drop off or

36

pickup of black-market marijuana.

### *The February 2023 Traffic Stop on XIAO and CHEN*

66.    On February 13, 2023, HSI Oklahoma City agents observed that the GPS tracker affixed to **LIN**'s black Mercedes SUV bearing Oklahoma license plate MCC600 indicated the vehicle was near Starkville, Mississippi. Although the vehicle is registered to Chang-Hui **CHEN** and **LIN's** suspected girlfriend Juan Lyu at **LIN's** residence 8117 NW 84th Street, Oklahoma City, surveillance has observed **LIN** driving it on almost a daily basis.

67.    A review of the GPS tracker data for the Mercedes indicated that at approximately 12:56 a.m. on February 13, 2023, the Mercedes departed the Sanabel Residence and began traveling eastbound toward Mississippi.  At approximately 11:13 a.m., GPS tracker data indicated the Mercedes stopped at/near a residence located at 49 Pointe Drive, Starkville, Mississippi.  The Mercedes was at this location for approximately 12 minutes before departing and appearing to travel back towards Oklahoma.  In my training and experience, the very short duration of their apparent stay in Mississippi after such a long drive is consistent with them picking up money and/or dropping off drugs.

68.    As law enforcement trailed the vehicle while it traveled on I-22 in Union County, Mississippi, the Mercedes exited the roadway.  Law enforcement then initiated a traffic stop on the Mercedes.  The Mississippi

37

Highway Patrol (MHP) trooper observed that the driver was visibly nervous and that his hands were shaking. The driver presented a Connecticut driver's license and was identified as **XIAO**. As the MHP trooper waited for **XIAO** to obtain the vehicle insurance information, **XIAO** kept asking the trooper if he could call someone. The trooper denied the request and asked **XIAO** to exit the vehicle. As **XIAO** exited, the trooper asked **XIAO** where they (**XIAO** and the other passenger, later identified as **CHEN**) were coming from. **XIAO** answered, "Memphis." As the trooper brought **XIAO** to his vehicle, he again asked **XIAO** where he was coming from. This time, **XIAO** stated Alabama but he could not name the specific town or city. During this questioning, **XIAO** appeared nervous and consistently looked at **CHEN**.

69. The trooper asked **XIAO** for consent to search the vehicle and **XIAO** consented. Upon searching the vehicle, the trooper located a black bag. When the trooper asked both **XIAO** and **CHEN** about the contents of the bag, both men indicated they did not know what was in it. An inspection of the bag's contents revealed two plastic bags of bundled U.S. currency, which totaled approximately $121,650.

70. **CHEN** agreed to speak with investigators after waiving his Miranda rights. During the interview, **CHEN** stated that he lives in Michigan but recently traveled to Oklahoma and then on to Mississippi. When asked where he and **XIAO** had been that day prior to the traffic stop,

38

CHEN replied they had just been looking around. CHEN could not name where in Mississippi he had been. He also stated that he has operated restaurants in Michigan for the last ten years. When asked what the money was for, CHEN stated that it was going to be used to purchase a house. CHEN identified his phone number as (231) 245-8483. XIAO did not agree to interview with investigators.

71. Toll analysis of multiple phone numbers utilized by LIN indicates that from November 15, 2021, until February 13, 2023, LIN had been in contact with phone number (405) 428-6175 approximately 2,308 times. Subscriber information on this number indicates that the phone belongs to XIAO. Toll analysis of LIN's multiple phones also indicates that from May 16, 2021, to February 13, 2023, LIN was in contact with phone number (231) 245-8483—the number that CHEN identified as his own—approximately 1,014 times.[8] Moreover, surveillance of LIN over the past several months indicates that LIN, XIAO, and CHEN are together almost on a daily basis.

72. Based on my training, experience, and knowledge of the investigation, I believe that CHEN was being untruthful and was attempting to cover up his and XIAO's involvement in LIN's marijuana trafficking

---

[8] Investigators also obtained loan documents from JP Morgan Chase for the Mercedes that CHEN and XIAO were stopped in. Those loan documents list this number, further corroborating my belief that this is CHEN's phone number.

USCA2 49

organization. For starters, **CHEN** is known to investigators, who are not aware of any houses he owns nor restaurants he operates in Michigan. In fact, agents believe **CHEN** is residing in Oklahoma and has been for the past several months. Further, **XIAO** and **CHEN** were stopped driving a vehicle also utilized by **LIN** and registered to **LIN's** residence, and they departed from one of **LIN**'s stash houses—the Sanabel Residence—to begin their journey to Mississippi. All of the foregoing, along with their inability to offer a plausible, legitimate explanation for their trip to Mississippi, leads me to believe that **XIAO** and **CHEN** were picking up over $100,000 in drug proceeds at **LIN's** behest.

### *The February 2023 Traffic Stop on ALLEN*

73. On February 21, 2023, law enforcement was conducting surveillance at the Sanabel Residence. Around the same time, law enforcement also surveilled **LIN, CHEN, XIAO**—and a fourth, still-unidentified male travel from Private Kitchen to the Sanabel Residence. While at the residence, a white Toyota van bearing Oklahoma license plate IKP742 (registered to Feng Li LI at 504 NW 181st St., Edmond, Oklahoma) arrived at the residence and parked in the street. Several minutes later, **XIAO** opened the garage and the van backed in. After approximately 30 seconds, the garage door opened and the van departed. Based on my training, experience, and knowledge of the investigation—including what happened

40

next—I believe that the white van was delivering marijuana to the Sanabel Residence.

74. After approximately 30 minutes, a blue-colored GMC Sierra bearing Oklahoma license plate LYK703 (the "blue GMC") arrived at the Sanabel Residence and backed into the driveway. The driver exited the vehicle and went into the residence. Agents had previously identified this vehicle as belonging to Terrance Allen (**ALLEN**), with a registered address of 8117 NW 84th St., Oklahoma City, Oklahoma—where surveillance has confirmed that **LIN** resides. **ALLEN** was previously identified as a suspected courier for **LIN** when, in May of 2022, **ALLEN** flew with **LIN** to Washington D.C. and then **ALLEN** separately flew to Tampa, Florida. While in Tampa, **ALLEN** was stopped while driving a U-Haul, during which law enforcement seized approximately 1,900 pounds of marijuana.

75. Approximately 30 minutes after **ALLEN**'s blue GMC arrived, the garage door of the Sanabel Residence opened and the blue GMC was backed into the garage. Agents observed the back doors of the vehicle being opened as well and an unknown individual putting something in the backseat. Approximately ten minutes later, the truck exited the garage and departed as **LIN** came out of the garage and watched the vehicle depart. Law enforcement observed the vehicle conduct multiple countersurveillance maneuvers, including making U-turns in the middle of the road. **ALLEN** also appeared

41

to be looking for law enforcement when he stopped at a gas station, exited his vehicle, and looked around before entering the store. **ALLEN** soon exited the gas station carrying an unknown item and returned to the Sanabel Residence, where **ALLEN** exited the vehicle and gave the item to **LIN** in the driveway, and departed.

76.     Agents continued to follow **ALLEN**, who continued to display what I believe were countersurveillance measures.   OHP eventually conducted a traffic stop on **ALLEN** after observing a traffic violation.   During the traffic stop, the OHP trooper could smell a strong odor of raw marijuana coming from the vehicle.   When asked if he possessed any marijuana in the vehicle, **ALLEN** indicated he does not use marijuana.   The OHP trooper then explained that was not what he asked, and the trooper asked **ALLEN** if he was in possession of any marijuana.   **ALLEN** responded by saying it was legal "here" (i.e., in Oklahoma).   Because of these evasive responses, paired with the smell of raw marijuana, OHP conducted a probable cause search of the vehicle, which yielded approximately 262 pounds of marijuana that was contained in several large black trash bags in the bed of the vehicle and a large duffel bag in the backseat of the vehicle.   **ALLEN** was subsequently arrested.

### *Discovery of the 66th St. Warehouse*

77.     On February 23, 2023, the GPS tracker affixed to **NAIYANG's** Maserati bearing Michigan license plate DTX2273 showed it arriving to 1825

SE 66th St., Oklahoma City. Further investigation established this was a warehouse, and in response, law enforcement installed a pole camera to surveil this location (the "66th St. Warehouse"). On March 8, 2023, the camera showed **NAIYANG** arriving in his Maserati. Two minutes after the arrival of **NAIYANG**, a white Lexus SUV arrived and parked next to **NAIYANG's** Maserati. An unknown male driver exited the SUV and retrieved a large, seemingly full black plastic trash bag from the cargo area of the SUV and brought it into the warehouse.

78. Approximately 15 minutes later, **DONG** and **YANG** arrived in their Chevrolet Silverado and entered the warehouse. Later, **DONG** was seen exiting the warehouse and going into one of the CONEX boxes located outside of the warehouse. **DONG** then exited the CONEX box with multiple bamboo sticks and brought them into the warehouse. I know from prior search warrants at marijuana grows, that bamboo sticks are used to prop up marijuana plants in an effort to help them grow. Database checks through OBN indicate that the address is a registered marijuana grow. It is my belief that **NAIYANG, DONG**, and **YANG** are utilizing the warehouse to operate a marijuana grow and also utilize the warehouse as a stash house for black-market marijuana. On multiple occasions individuals have been documented bringing large apparently full black trash bags and boxes into the warehouse.

79. These suspicions were confirmed on March 9, 2023, when

43

NAIYANG arrived at the warehouse followed by a white pickup truck pulling a large enclosed trailer.   The truck backed the trailer up to the warehouse and the driver, along with NAIYANG, began unloading marijuana plants from the trailer into the warehouse.   Based on the amount of plants they offloaded, it appeared that the trailer was full of marijuana plants.

80.   On March 26, 2023, GPS location information on NAIYANG's cellular device (616) 606-2695 indicated that NAIYANG traveled from the 66th St. Warehouse to Dale, Oklahoma and then Ada, Oklahoma.   NAIYANG spent several hours in these areas before returning to the 66th St. Warehouse. Upon returning, NAIYANG was observed bringing two boxes—that appeared to be full—from his truck into the warehouse.

81.   On several more occasions, including March 29, April 2, and April 6, 2023, location information on NAIYANG's cellular device indicate that he once again traveled to remote areas such as Ada, Tecumseh, and Shawnee, Oklahoma, where he stayed for extended periods of time.

82.   I find the travel to remote areas of Oklahoma significant for two reasons.   First, I know through this investigation and speaking with law enforcement in Oklahoma that these particular areas where NAIYANG went are popular for illegal Chinese-owned marijuana grows that are operating illegally, outside of compliance with Oklahoma's medical marijuana statutory regime—i.e., they are grows sourcing the black market.   Second, financial

44

analysis of **NAIYANG**'s brother BRANDON's Bank of America account ending in 0061 indicated that on November 7, 2022, there was an ATM deposit in Oklahoma City for $2,353.21.   Financial documents provided by Bank of America indicate that the deposit was in the form of a check from the People's Electric Cooperative, made payable to **NAIYANG**.[9]   The address listed for **NAIYANG** was 18609 County Road 1580, Ada, Oklahoma.   Database checks through OBN indicate that on November 3, 2022, OBN received information that there was a grow at this residence and that it had been abandoned.   Upon arrival, OBN observed that the grow did look abandoned and spoke with the neighbors who indicated that the occupants of the grow had left approximately one week prior and had not returned.

83.    I believe that the check from the People's Electric Cooperative was reimbursement to **NAIYANG** who it appears holds **the** utilities in his name at this grow.   I believe that **NAIYANG** discontinued utilities at the residence and based on travel to these remote areas is picking up from other marijuana grows that are supplying the LIN DTO with black-market marijuana for distribution.

84.    Based on the aforementioned facts, I believe that **NAIYANG** is

---

[9]    Text messages obtained from BRANDON's phone during a border search in November of 2022 indicate that BRANDON and **NAIYANG** are sharing this account, as **NAIYANG** will periodically ask BRANDON for the passcode.

operating and/or being supplied by multiple marijuana grows in Oklahoma. Although the marijuana grow at the 1825 Warehouse is registered in OBN as a marijuana grow, I know from my training and experience that a large portion of marijuana grows that are registered with the state are still operating illegally. In fact, investigators know that Oklahoma's recent influx of marijuana growers—like the LIN DTO—is due to the fact that growers have been able to supply the black market despite nevertheless being registered with the state. Here, I believe that the LIN DTO, despite being registered with the state, is operating the 1825 Warehouse illegally, as unknown individuals appear to be dropping off large trash bags and boxes to the 1825 Warehouse. And to be clear, I know such behavior—in addition to being illegal under federal law—also falls outside of permitted marijuana sales under Oklahoma's medical marijuana regime.

## CONCLUSION

85. Based on my training and experience, and the foregoing information, I submit that there is probable cause to believe that **NAIGANG LIN**, **a/k/a "NAI LIN" (LIN)**; **NAIYANG LIN, a/k/a "NAI YANG LIN" (NAIYANG), LI JIN YANG, a/k/a "LILY" (YANG), DONG LIN (DONG), CHANG-HUI CHEN (CHEN), MEIYAN XIAO (XIAO), BARRY STADLER (STADLER), DANIEL WALSH (WALSH), TERRANCE ALLEN (ALLEN), FEI XIE (XIE), AHMED HARROLD (HARROLD),** and **LUIS RAFAEL**

46

**LARIOS-BENITES (LARIOS)**, knowingly and intentionally conspired together, along with other persons both known and unknown, for their participation in a drug conspiracy—that is a conspiracy to possess with intent to distribute and to distribute marijuana, from in or about January 1, 2019, and continuing thereafter until on or about May 1, 2023, in violation of 21 U.S.C. § 846. It is therefore requested that arrest warrants be issued for the offense listed above.

JOSH REINSCH
Special Agent
Homeland Security Investigations

Sworn to before me this 2nd day of May 2023.

SHON T. ERWIN
United States Magistrate Judge
Western District of Oklahoma

```
MIME-Version:1.0
From:ecf_bounces@nyed.uscourts.gov
To:nobody@nyed.uscourts.gov
Bcc:
--Case Participants: Andrew Reich (andrew.reich@usdoj.gov), Jacob B. Mitchell
(jacobbarclaymitchell@gmail.com), Magistrate Judge Lois Bloom
(estee_ward@nyed.uscourts.gov, isaac_kaplan@nyed.uscourts.gov,
lois_bloom@nyed.uscourts.gov, samantha_wilhelm@nyed.uscourts.gov,
sonia_galeano@nyed.uscourts.gov, victoria_pilger@nyed.uscourts.gov,
vivian_martinez@nyed.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:17882059@nyed.uscourts.gov
Subject:Activity in Case 1:23-mj-00447-LB USA v. Yang Arrest - Rule 40
Content–Type: text/html
```

## U.S. District Court

## Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered on 5/15/2023 at 11:57 AM EDT and filed on 5/10/2023

**Case Name:**    USA v. Yang

**Case Number:**   1:23–mj–00447–LB

**Filer:**

**Document Number:** No document attached

**Docket Text:**
**Arrest (Rule 40) of Li Jin Yang (MS)**


**1:23–mj–00447–LB–1 Notice has been electronically mailed to:**

Jacob B. Mitchell    jacobbarclaymitchell@gmail.com

Andrew Reich    Andrew.Reich@usdoj.gov

**1:23–mj–00447–LB–1 Notice will not be electronically mailed to:**

```
MIME-Version:1.0
From:ecf_bounces@nyed.uscourts.gov
To:nobody@nyed.uscourts.gov
Bcc:
--Case Participants: Andrew Reich (andrew.reich@usdoj.gov), Jacob B. Mitchell
(jacobbarclaymitchell@gmail.com), Magistrate Judge Lois Bloom
(estee_ward@nyed.uscourts.gov, isaac_kaplan@nyed.uscourts.gov,
lois_bloom@nyed.uscourts.gov, samantha_wilhelm@nyed.uscourts.gov,
sonia_galeano@nyed.uscourts.gov, victoria_pilger@nyed.uscourts.gov,
vivian_martinez@nyed.uscourts.gov)
--Non Case Participants: Pretrial Matters (ecfmatters@nyept.uscourts.gov)
--No Notice Sent:

Message-Id:17882100@nyed.uscourts.gov
Subject:Activity in Case 1:23-mj-00447-LB USA v. Yang Arraignment
Content-Type: text/html
```

### U.S. District Court

### Eastern District of New York

**Notice of Electronic Filing**


The following transaction was entered on 5/15/2023 at 12:01 PM EDT and filed on 5/10/2023

| | |
|---|---|
| **Case Name:** | USA v. Yang |
| **Case Number:** | 1:23-mj-00447-LB |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **Minute Entry for proceedings held before Magistrate Judge Lois Bloom: For a Removal hearing to the Western District of OklahomaArraignment as to Li Jin Yang (1) Count Complaint held on 5/10/2023, Attorney Appointment Hearing as to Li Jin Yang held on 5/10/2023, Initial Appearance in Rule 5(c)(3) Proceedings as to Li Jin Yang held on 5/10/2023. AUSA Andrew Reich; CJA counsel Jacob Mitchell. Waiver of hearing entered. Brady Act ordered on the record. Both parties on consent for a bail package with conditions. The Court granted bail as stated on the record. 1 Surety was sworn and advised and signed the bond. The defendant was advised of all conditions and signed the bond. The Defendant was released. (FTR Log #4:41-5:28.) (MS)**


**1:23-mj-00447-LB-1 Notice has been electronically mailed to:**

Jacob B. Mitchell     jacobbarclaymitchell@gmail.com

Andrew Reich     Andrew.Reich@usdoj.gov

**1:23-mj-00447-LB-1 Notice will not be electronically mailed to:**

USCA2 60

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK

Case No. 23 mj 447

United States of America

v. Li Jin Yang , _Defendant_

## ORDER SETTING CONDITIONS OF RELEASE AND APPEARANCE BOND

### RELEASE ORDER

It is hereby ORDERED that the above-named defendant be released subject to the Conditions of Release below and:

- [ ] On **Personal Recognizance** on the defendant's promise to appear at all scheduled proceedings as required, or
- [x] Upon **Bond** executed by the defendant in the amount of $ 200,000.00 , which shall be
  - [x] unsecured; [x] cosigned by the financially responsible sureties identified on this bond;
  - [ ] secured by Collateral set forth on the Appearance Bond Supplement.

### CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to the following conditions, which the Court finds are the least restrictive conditions necessary to reasonably assure the appearance of the defendant as required and the safety of any other person and the community:

(1) The defendant must appear in court as required and surrender as directed for service of any sentence imposed.
(2) The defendant must not commit a federal, state or local crime while on release.
(3) The defendant must cooperate in the collection of DNA sample if it is authorized by 34 U.S.C. § 40702.
(4) The defendant must advise the Court in writing before making any change in residence or telephone number.
(5) The defendant must not possess a firearm, destructive device or other dangerous weapon.
(6) The defendant must not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner. Marijuana is still prohibited under federal law.
(7) As marked below, the defendant must also:
  - [ ] (a) submit to pretrial supervision and report to Pretrial Services as directed. The defendant is subject to random home contacts and verification of employment as deemed appropriate to monitor compliance with the conditions of release. The defendant shall notify Pretrial Services as soon as possible of any arrests.
  - [ ] (b) [ ] continue or actively seek employment. [ ] continue or start an education and/or vocational program.
  - [x] (c) surrender any passport to Pretrial Services by _____ and not obtain a passport or any international travel document.
  - [x] (d) not leave the following areas except for travel to and from court: [x] New York City; [x] Long Island; [ ] New York State; [ ] New Jersey; [ ] Continental United States; [ ] as approved by Pretrial Services; [x] other: _michigan and points between + OR western District (handwritten)_
  - [x] (e) not have any contact with the following individual(s), location or entity: _Naijue Li_ or at a location approved by Pretrial Services.
  - [ ] (f) maintain residence at: _____
  - [ ] (g) undergo testing, evaluation and/or treatment for substance abuse as directed by Pretrial Services.
  - [ ] (h) undergo evaluation and treatment for mental health problems, as directed by Pretrial Services.
  - [x] (i) be subject to the following component of location monitoring, with technology as determined by Pretrial Services:
    - [x] (i) **Curfew** – restricted to residence [ ] daily from _____ to _____ ; or [x] as directed by Pretrial Services.
    - [ ] (ii) **Home Detention** – restricted to residence at all times, except for court appearances, court-ordered obligations, attorney visits, religious services, medical appointments, employment, education, substance abuse/mental health services and other activities approved in advance by Pretrial Services. Additionally, the Court permits: _____
    - [ ] (iii) **Home Incarceration** – 24-hour lock-down at residence, except for medical necessities, court appearances, and any other activities ordered by the Court.
    - [ ] (iv) **Stand Alone Monitoring** – no residential restrictions; this condition will be used in conjunction with global positioning system (GPS) technology.
  - [ ] (j) pay all or part of cost of location monitoring, based on ability to pay as determined by Pretrial Services. _____
  - [ ] (k) _____

USCA2 61

## APPEARANCE BOND

I, the undersigned defendant, and each surety who signs the bond, acknowledge that I have read this Order Setting Conditions of Release and Appearance Bond and have either read all the other conditions of release or have had those conditions explained to me. (If the bond is secured by collateral, complete Appearance Bond Supplement.)

| /S/ | | 235 - North Bauer St, Michigan | 5/10/23 |
|---|---|---|---|
| Lin Yang , Surety | | Address | Date |
| , Surety | | Address | Date |
| , Surety | | Address | Date |

## RELEASE OF THE BOND

This appearance bond may be terminated at any time by the Court. This bond will be satisfied, and the collateral will be released when either: (1) the defendant is found not guilty on all charges, or (2) the defendant reports to serve a sentence.

## FORFEITURE OF THE BOND

If the defendant does not comply with the conditions set forth in this Order Setting Conditions of Release and Appearance Bond, this appearance bond may be forfeited and the Court may immediately order the amount of the bond and any collateral to be surrendered to the United States. At the request of the United States, the Court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT – YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

- Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.
- While on release, if you commit a federal felony offense, the punishment is an additional prison term of not more than ten years, and for a federal misdemeanor offense, the punishment is an additional prison term of not more than one year. This sentence will be consecutive to (i.e., must follow) any other sentence you receive.
- It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the Court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.
- If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:
  (1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;
  (2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or more than $250,000 or imprisoned for not more than five years, or both;
  (3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;
  (4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.
- A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

## ACKNOWLEDGMENT OF THE DEFENDANT

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
Defendant's Signature

Release of the Defendant is hereby ordered on 5/10/23 .
Date

Lin Bloom , US M J
Judicial Officer's Signature

AO 466A (Rev. 12/17) Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

# UNITED STATES DISTRICT COURT
for the

Eastern District of New York ▾

| | |
|---|---|
| United States of America | ) |
| v. | ) Case No. 23 MJ 447 |
| LJ Jin Yang | ) |
| *Defendant* | ) Charging District's Case No. |
| | ) |

## WAIVER OF RULE 5 & 5.1 HEARINGS
### (Complaint or Indictment)

I understand that I have been charged in another district, the *(name of other court)* Western District
at Oklahoma

I have been informed of the charges and of my rights to:

(1)     retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2)     an identity hearing to determine whether I am the person named in the charges;

(3)     production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4)     a preliminary hearing to determine whether there is probable cause to believe that an offense has been committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise, unless I have been indicted beforehand.

(5)     a hearing on any motion by the government for detention;

(6)     request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

☑    an identity hearing and production of the warrant.

☐    a preliminary hearing.

☐    a detention hearing.

☐    an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary or detention hearing to which I may be entitled in this district. I request that my
☐ preliminary hearing and/or ☐ detention hearing be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date: 5/10/23

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Jacob Mitchell
*Printed name of defendant's attorney*

**CJA-23**
(Rev 3/21)

# FINANCIAL AFFIDAVIT
IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE

| IN THE UNITED STATES | ☐ DISTRICT COURT | ☐ COURT OF APPEALS | ☐ OTHER *(Specify Below)* |
|---|---|---|---|

FOR

AT

LOCATION NUMBER

**IN THE CASE OF**

United States v. Yang

**PERSON REPRESENTED** *(Show your full name)*

Li Jin Yang

| 1 ☐ Defendant - Adult |
| 2 ☐ Defendant - Juvenile |
| 3 ☐ Appellant |
| 4 ☐ Probation Violator |
| 5 ☐ Supervised Release Violator |
| 6 ☐ Habeas Petitioner |
| 7 ☐ 2255 Petitioner |
| 8 ☐ Material Witness |
| 9 ☐ Other *(Specify)* |

**DOCKET NUMBERS**

Magistrate Judge 2:23 5/10/23

District Court

Court of Appeals

**CHARGE/OFFENSE** *(Describe if applicable & check box→)*   ☑ Felony   ☐ Misdemeanor

## ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

| | | |
|---|---|---|
| **INCOME & ASSETS** | **EMPLOYMENT** | Do you have a job? ☑ Yes ☐ No<br>**IF YES,** how much do you earn per month? $ 1,000<br>Will you still have a job after this arrest? ☐ Yes ☐ No ☑ Unknown |

**PROPERTY** — Do you own any of the following, and if so, what is it worth?

| | APPROXIMATE VALUE | DESCRIPTION & AMOUNT OWED |
|---|---|---|
| Home | $ | |
| Car/Truck/Vehicle | $ | |
| Boat | $ | |
| Stocks/bonds | $ | |
| Other property | $ | |

**CASH & BANK ACCOUNTS** — Do you have any cash, or money in savings or checking accounts? ☐ Yes ☑ No

**IF YES,** give the total approximate amount after monthly expenses $ N/A

**OBLIGATIONS, EXPENSES, & DEBTS**

How many people do you financially support? 1

| BILLS & DEBTS | MONTHLY EXPENSE | TOTAL DEBT |
|---|---|---|
| Housing | $ 200 | $ |
| Groceries | $ 300 | $ |
| Medical expenses | $ | $ |
| Utilities | $ 100 | $ |
| Credit cards | $ | $ |
| Car/Truck/Vehicle | $ | $ |
| Childcare | $ | $ |
| Child support | $ | $ |
| Insurance | $ | $ |
| Loans | $ | $ |
| Fines | $ | $ |
| Other | $ 400 | $ |

I certify under penalty of perjury that the foregoing is true and correct.

_____
SIGNATURE OF DEFENDANT
(OR PERSON SEEKING REPRESENTATION)

05/10/2023
Date

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                -v-

___Li Jin Yang _____,

                Defendant(s).

23-MJ-447

<u>ORDER</u>

---

__Lois Bloom __, United States Magistrate Judge:

       This Order is entered, pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No 116–182, 134 Stat. 894 (Oct. 21, 2020), to confirm the Government's disclosure obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations.

       The Government must disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" and that is known to the Government.  *Id.* at 87.  This obligation applies regardless of whether the defendant requests this information or whether the information would itself constitute admissible evidence.  The Government shall disclose such information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case.

       As part of these obligations, the Government must disclose any information that can be used to impeach the trial testimony of a Government witness within the meaning of *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny.  Such information must be disclosed sufficiently in advance of trial in order for the defendant to make effective use of it at trial or at such other time as the Court may order.[1]

---

[1] This Order does not purport to set forth an exhaustive list of the Government's disclosure obligations.

The foregoing obligations are continuing ones and apply to materials that become known to the Government in the future. These obligations also apply to information that is otherwise subject to disclosure regardless of whether the Government credits it.

In the event the Government believes that a disclosure under this Order would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of its obligations, which may include in camera review or withholding or subjecting to a protective order all or part of the information otherwise subject to disclosure.[2]

For purposes of this Order, the Government has an affirmative obligation to seek all information subject to disclosure under this Order from all current or former federal, state, and local prosecutors, law enforcement officers, and other officers who have participated in the prosecution, or investigation that led to the prosecution, of the offense or offenses with which the defendant is charged.

If the Government fails to comply with this Order, the Court, in addition to ordering production of the information, may:

    (1) specify the terms and conditions of such production;

    (2) grant a continuance;

    (3) impose evidentiary sanctions;

    (4) impose contempt or other sanctions on any lawyer responsible for violations of the Government's disclosure obligations, or refer the matter to disciplinary authorities;

    (5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or

    (6) enter any other order that is just under the circumstances.

---

[2] The Classified Information Procedures Act sets forth separate procedures to be followed in the event that the Government believes matters relating to classified information may arise in connection with the prosecution. *See* 18 U.S.C. app. 3 §§ 1 *et seq.*

SO ORDERED.

Dated: 05-10-2023
      BROOKLYN, NEW YORK


                                    _____Lois Bloom_____
                                    United States Magistrate Judge

CJA 20 APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL (Rev. 5/99)

| 1. CIR./DIST./ DIV. CODE EDNY | 2. PERSON REPRESENTED Li Jin Yang | | VOUCHER NUMBER |
|---|---|---|---|

| 3. MAG. DKT./DEF. NUMBER 23-MJ-447 | 4. DIST. DKT./DEF. NUMBER | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
|---|---|---|---|

| 7. IN CASE/MATTER OF *(Case Name)* USA vs Li Jin Yang | 8. PAYMENT CATEGORY X Felony □ Petty Offense □ Misdemeanor □ Other Appeal | 9. TYPE PERSON REPRESENTED X Adult Defendant □ Appellant □ Juvenile Defendant □ Appellee Other | 10. REPRESENTATION TYPE *(See Instructions)* CC |
|---|---|---|---|

11. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*

12. ATTORNEY'S NAME *(First Name, M.I., Last Name, including any suffix),* AND MAILING ADDRESS

Jacob Mitchell Law Office of Jacob B. Mitchell
225 Broadway, Suite 2815
New York, NY 10007
Cell: 540-273-3400

Telephone Number :

14. NAME AND MAILING ADDRESS OF LAW FIRM *(Only provide per instructions)*

13. COURT ORDER

x O Appointing Counsel □ C Co-Counsel
□ F Subs For Federal Defender □ R Subs For Retained Attorney
□ P Subs For Panel Attorney □ Y Standby Counsel

Prior Attorney's Name:
  Appointment Dates:
□ Because the above-named person represented has testified under oath or has otherwise satisfied this Court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require, the attorney whose name appears in Item 12 is appointed to represent this person in this case, OR
□ Other *(See Instructions)*

_____
Signature of Presiding Judicial Officer or By Order of the Court

05/10/2023                          05/10/2023
Date of Order                      Nunc Pro Tune Date
Repayment or partial repayment ordered from the person represented for this service at time appointment.    □ YES    □ NO

| CLAIM FOR SERVICES AND EXPENSES | | FOR COURT USE ONLY | | |
|---|---|---|---|---|
| CATEGORIES (Attach itemization of services with dates) | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH. ADJUSTED HOURS | MATH/TECH. ADJUSTED AMOUNT | ADDITIONAL REVIEW |

| | | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH. ADJUSTED HOURS | MATH/TECH. ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|---|
| 15. In Court | a. Arraignment and/or Plea | | | | | |
| | b. Bail and Detention Hearings | | | | | |
| | c. Motion Hearings | | | | | |
| | d. Trial | | | | | |
| | e. Sentencing Hearings | | | | | |
| | f. Revocation Hearings | | | | | |
| | g. Appeals Court | | | | | |
| | h. Other *(Specify on additional sheets)* | | | | | |
| | (RATE PER HOUR = $        )    TOTALS: | | | | | |
| 16. Out of Court | a. Interviews and Conferences | | | | | |
| | b. Obtaining and reviewing records | | | | | |
| | c. Legal research and brief writing | | | | | |
| | d. Travel time | | | | | |
| | e. Investigative and other work *(Specify on additional sheets)* | | | | | |
| | (RATE PER HOUR = $        )    TOTALS: | | | | | |
| 17. | Travel Expenses *(lodging, parking, meals, mileage, etc.)* | | | | | |
| 18. | Other Expenses *(other than expert, transcripts, etc.)* | | | | | |
| GRAND TOTALS (CLAIMED AND ADJUSTED): | | | | | | |

| 19. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE FROM: _____ TO: _____ | 20. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION | 21. CASE DISPOSITION |
|---|---|---|

22. CLAIM STATUS    □ Final Payment    □ Interim Payment Number _____    □ Supplemental Payment

Have you previously applied to the court for compensation and/or reimbursement for this    □ YES    □ NO    If yes, were you paid?    □ YES    □ NO
Other than from the Court, have you, or to your knowledge has anyone else, received payment *(compensation or anything of value)* from any other source in connection with this representation?    □ YES    □ NO    If yes, give details on additional sheets.
I swear or affirm the truth or correctness of the above statements.

Signature of Attorney _____    Date _____

| APPROVED FOR PAYMENT — COURT USE ONLY | | | | |
|---|---|---|---|---|
| 23. IN COURT COMP. | 24. OUT OF COURT COMP. | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMT. APPR./CERT. |
| 28. SIGNATURE OF THE PRESIDING JUDICIAL OFFICER | | | DATE | 28a. JUDGE/MAG. JUDGE CODE |
| 29. IN COURT COMP. | 30. OUT OF COURT COMP. | 31. TRAVEL EXPENSES | 32. OTHER EXPENSES | 33. TOTAL AMT. APPROVED |
| 34. SIGNATURE OF CHIEF JUDGE, COURT OF APPEALS (OR DELEGATE) *Payment approved in excess of the statutory threshold amount.* | | | DATE | 34a. JUDGE CODE |

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK

Case No. 23 m j 447

United States of America

v. Li Jin Yang , *Defendant*

### ORDER SETTING CONDITIONS OF RELEASE AND APPEARANCE BOND

## RELEASE ORDER

It is hereby ORDERED that the above-named defendant be released subject to the Conditions of Release below and:

( ☐ ) On **Personal Recognizance** on the defendant's promise to appear at all scheduled proceedings as required, or

( ☒ ) Upon **Bond** executed by the defendant in the amount of $ 200,000.00 , which shall be
   ☒ unsecured; ☒ cosigned by the financially responsible sureties identified on this bond;
   ☐ secured by Collateral set forth on the Appearance Bond Supplement.

## CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to the following conditions, which the Court finds are the least restrictive conditions necessary to reasonably assure the appearance of the defendant as required and the safety of any other person and the community:

(1)   The defendant must appear in court as required and surrender as directed for service of any sentence imposed.
(2)   The defendant must not commit a federal, state or local crime while on release.
(3)   The defendant must cooperate in the collection of DNA sample if it is authorized by 34 U.S.C. § 40702.
(4)   The defendant must advise the Court in writing before making any change in residence or telephone number.
(5)   The defendant must not possess a firearm, destructive device or other dangerous weapon.
(6)   The defendant must not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner. Marijuana is still prohibited under federal law.
(7)   As marked below, the defendant must also:

   ( ☐ ) (a)  submit to pretrial supervision and report to Pretrial Services as directed. The defendant is subject to random home contacts and verification of employment as deemed appropriate to monitor compliance with the conditions of release. The defendant shall notify Pretrial Services as soon as possible of any arrests.

   ( ☐ ) (b) ☐ continue or actively seek employment. ☐ continue or start an education and/or vocational program.

   ( ☒ ) (c) ☐ surrender any passport to Pretrial Services by _____ and not obtain a passport or any international travel document.

   ( ☒ ) (d) ☐ not leave the following areas except for travel to and from court: ☒ New York City; ☒ Long Island;
   ☐ New York State; ☐ New Jersey; ☐ Continental United States; ☐ as approved by Pretrial Services;
   ☐ other: michigan and points between + OR Western District
   _____ or at a location approved by Pretrial Services.

   ( ☒ ) (e) not have any contact with the following individual(s), location or entity: Maigue Lin

   ( ☐ ) (f)  maintain residence at: _____

   ( ☐ ) (g)  undergo testing, evaluation and/or treatment for substance abuse as directed by Pretrial Services.

   ( ☐ ) (h)  undergo evaluation and treatment for mental health problems, as directed by Pretrial Services.

   ( ☒ ) (i)  be subject to the following component of location monitoring, with technology as determined by Pretrial Services:
   ( ☒ ) (i)   **Curfew** – restricted to residence ☐ daily from _____ to _____ ; or
   ☒ as directed by Pretrial Services.

   ( ☐ ) (ii)  **Home Detention** – restricted to residence at all times, except for court appearances, court-ordered obligations, attorney visits, religious services, medical appointments, employment, education, substance abuse/mental health services and other activities approved in advance by Pretrial Services. Additionally, the Court permits: _____

   ( ☐ ) (iii) **Home Incarceration** – 24-hour lock-down at residence, except for medical necessities, court appearances, and any other activities ordered by the Court.

   ( ☐ ) (iv) **Stand Alone Monitoring** – no residential restrictions; this condition will be used in conjunction with global positioning system (GPS) technology.

   ( ☐ ) (j)  pay all or part of cost of location monitoring, based on ability to pay as determined by Pretrial Services.
   _____

   ( ☐ ) (k) _____

## APPEARANCE BOND

I, the undersigned defendant, and each surety who signs the bond, acknowledge that I have read this Order Setting Conditions of Release and Appearance Bond and have either read all the other conditions of release or have had those conditions explained to me. (If the bond is secured by collateral, complete Appearance Bond Supplement.)

/s/
Lin Yang                              235 - North Bauer St, Michigan        5/10/23
_____, Surety    _____    _____
                              Address                          Date

_____, Surety    _____    _____
                              Address                          Date

_____, Surety    _____    _____
                              Address                          Date

## RELEASE OF THE BOND

This appearance bond may be terminated at any time by the Court. This bond will be satisfied, and the collateral will be released when either: (1) the defendant is found not guilty on all charges, or (2) the defendant reports to serve a sentence.

## FORFEITURE OF THE BOND

If the defendant does not comply with the conditions set forth in this Order Setting Conditions of Release and Appearance Bond, this appearance bond may be forfeited and the Court may immediately order the amount of the bond and any collateral to be surrendered to the United States. At the request of the United States, the Court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT – YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

- Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.
- While on release, if you commit a federal felony offense, the punishment is an additional prison term of not more than ten years, and for a federal misdemeanor offense, the punishment is an additional prison term of not more than one year. This sentence will be consecutive to (*i.e.*, must follow) any other sentence you receive.
- It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the Court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.
- If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:
    (1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;
    (2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or more than $250,000 or imprisoned for not more than five years, or both;
    (3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;
    (4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.
- A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

## ACKNOWLEDGMENT OF THE DEFENDANT

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
Defendant's Signature

Release of the Defendant is hereby ordered on  5/10/23 .       Lin Bloom      , US M J
                                            Date                  Judicial Officer's Signature

USCA2 69